NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted April 12, 2021[*]
Decided April 23, 2021

**Before**

ILANA DIAMOND ROVNER, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 20-1184

| | |
|---|---|
| BEVERLY A. GLADNEY, *Plaintiff-Appellant,* | Appeal from the United States District Court for the Eastern District of Wisconsin. |
| *v.* | No. 18-CV-1580 |
| ANDREW M. SAUL, *Defendant-Appellee.* | Nancy Joseph, *Magistrate Judge.* |

**O R D E R**

Beverly Gladney challenges the denial of her application for supplemental security income and disability insurance benefits based on symptoms that she attributes to carbon monoxide and black mold poisoning. An administrative law judge found Gladney not disabled based on her ability to perform light work with certain limits. The

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

district court upheld the denial of benefits. Because substantial evidence supports the ALJ's decision, we affirm.

Gladney, now 57 years old, says she started feeling weakness, dizziness, balance problems, and worsening vision around 2008. By 2012, her symptoms had gotten so bad that she took an extended leave of absence from her job as a teacher's aide. She never returned, eventually resigning and applying for disability benefits in 2014.

Since 2012, Gladney has sought treatment for a myriad of symptoms, including fatigue, weakness, dizziness, blurry vision, heart palpitations, abdominal pain, and numbness and tingling in her hands. She claims that these symptoms are the result of carbon monoxide poisoning from a gas leak in her apartment from 2008 to 2012 and black mold poisoning in 2016. She has often made this claim to her treating physicians, including during several trips to urgent care facilities and emergency rooms, but no doctor or test has ever diagnosed environmental poisoning. For example, in 2012, she went to the emergency room complaining of carbon monoxide poisoning, but tests revealed her carbon monoxide levels were normal. Later that year, she sought treatment for stomach or liver problems, again suggesting carbon monoxide as the cause. The doctor found no evidence of carbon monoxide poisoning and instead suggested hypochondriasis, an anxiety disorder.

Gladney sought to confirm her belief that she suffered carbon monoxide poisoning by seeing psychologist Dr. Patricia Stanik. She told Dr. Stanik that she had been exposed to carbon monoxide, and Dr. Stanik conducted a battery of tests for mental functioning. The tests identified some limitations, particularly mild memory impairments. Dr. Stanik found that Gladney would have trouble solving complex problems, understanding instructions and scheduling, adjusting to changing situations, and making decisions. She noted Gladney's obsession with her health and found that Gladney is prone to developing physical symptoms from stress. She diagnosed Gladney with mild neurocognitive disorder and noted that her findings were consistent with carbon monoxide poisoning (based on Gladney's report of exposure). She recommended therapy, biofeedback training, and guided imagery and told Gladney to contact the Mayo Clinic to monitor her neurological health. There is no evidence that Gladney pursued any of these options.

The agency's reviewing physicians determined that Gladney had no physical limitations, but the reviewing psychologists assigned several mental limitations. As relevant here, they found that she had moderate limitations in carrying out detailed instructions, completing a normal workday, and interacting with the public. But they

found she could make simple decisions, carry out simple instructions, and interact with bosses and coworkers and occasionally with the public.

In 2017, Gladney testified at a hearing before an ALJ that she left her job because her physical and mental symptoms had gotten so severe that she could no longer complete her work. She said she had problems with attention, focus, and memory that were so bad she was unable to concentrate for more than a few seconds or complete tasks at work. She also testified to respiratory problems, irregular heartbeats, abdominal pain, digestive problems, numbness, dizziness, and weakness in her hands, arms, and legs. She also reported struggling with social interactions, and isolating herself as a result, even though she used to be quite social. But she remained able to manage her daily life: taking her medication without reminders, using public transportation, shopping occasionally, and doing household chores. She referred to detailed notes, which she said she needed because of problems with her short-term memory.

A vocational expert also testified about the jobs that would be available to someone with Gladney's functional limitations. As relevant here, the ALJ asked the expert to consider job opportunities for a hypothetical individual with Gladney's qualifications who could perform light work that required only simple instructions, occasional decisions, and occasional changes. The expert opined that such a person would not be able to perform Gladney's past work as a teacher's aide but could work as a garment sorter, an inspector, or an assembler.

The ALJ concluded that Gladney was not disabled. Applying the requisite five-step analysis, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), the ALJ determined that (step 1) Gladney had not engaged in substantial gainful activity during the relevant time period; (step 2) her anxiety, somatic symptom disorder, mild neurocognitive disorder, and bilateral carpal tunnel syndrome were severe impairments; but (step 3) none of those impairments equaled a listed impairment; (step 4) she retained the residual functional capacity to perform light work, subject to the restrictions described to the vocational expert; and (step 5) she could not perform her past relevant work as a babysitter or teacher's aide, but there were a significant number of jobs in the national economy to which she could transition.

Gladney sought review in the district court, arguing primarily that the ALJ should have included carbon monoxide and black mold poisoning as severe impairments. The district court—Magistrate Judge Joseph, presiding by consent under 28 U.S.C. § 636(c)—surveyed the medical evidence and observed that, while Gladney had reported carbon monoxide and black mold poisoning to several doctors, none

concurred with her assessment, nor was it confirmed by any tests. The court therefore upheld the ALJ's determination.

We review the district court's decision de novo, asking whether the ALJ's decision is based on substantial evidence. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018); *see also* 42 U.S.C. § 405(g). This is not a high threshold; it requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). If reasonable minds could differ, we will defer to the ALJ's credibility determinations and weighing of the evidence. *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

Gladney first suggests that the ALJ should have included carbon monoxide and black mold poisoning among her serious impairments. But an impairment "must be established by objective medical evidence" and cannot be based solely on the claimant's testimony. 20 C.F.R. § 404.1521. Gladney does not point to any objective medical evidence that she suffered carbon monoxide or black mold poisoning; rather, the record is replete with doctors finding no evidence of carbon monoxide poisoning, despite her repeated claims. She responds that these poisons are often misdiagnosed. Even if that is true, Gladney had the burden to submit objective medical evidence that environmental poisoning made her sick. *See Scheck v. Barnhart*; 357 F.3d 697, 702 (7th Cir. 2004). Without any such evidence, the ALJ reasonably excluded carbon monoxide and black mold poisoning from the list of Gladney's severe impairments.

Next, Gladney argues that at least three of the impairments that the ALJ deemed "severe" automatically qualify her as disabled at step 3. Specifically, she says she meets the listings for neurocognitive disorder (12.02), anxiety (12.06), and somatic symptom disorder (12.07). *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1. She emphasizes her anxiety, which, she correctly notes, she has been diagnosed with several times. But even if a claimant has been diagnosed with a condition, and even if that condition is deemed to be a severe impairment at step 2, it may not be so limiting as to be per se disabling at step 3. *Id*; *see also Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) ("conditions must not be confused with disabilities"). To be per se disabled based on any of these three conditions, Gladney had to satisfy either the paragraph B criteria (limited mental functioning) or the paragraph C criteria (serious and persistent). *Id*. (For somatic symptom disorder, B is required. *Id*.)

The ALJ reasonably found that Gladney did not meet the paragraph B criteria, which consist of four areas of mental functioning that the ALJ evaluates based on the record. *Id* at 12.00A(2)(b). A claimant must have an extreme limitation in one of these

areas or a marked limitation in two. *Id* at 12.00F(2). The ALJ determined that Gladney had no more than a moderate limitation in any of the four areas. She relied on Gladney's testimony, Dr. Stanik's opinion, and Gladney's treatment records. Gladney does not point to evidence of a marked or extreme limitation in any area of mental functioning, nor does she identify any error in the ALJ's reasoning. Similarly, the record supports the finding that Gladney does not meet the paragraph C criteria. As the ALJ explained, one requirement of paragraph C is that the claimant receives ongoing treatment for the mental disorder. But the record does not show that Gladney is receiving any treatment for her anxiety or other impairments.

Without medical evidence that shows she meets the requirements of paragraph B or C, Gladney did not establish that she is disabled at step 3, and the ALJ rightly proceeded to assess her residual functional capacity for work.

Next, Gladney argues generally that the ALJ erroneously found her capable of things she cannot do and improperly dismissed the severity of her problems with memory, focus, and concentration. Rather than reweigh the evidence, we ask only whether the ALJ "built an accurate and logical bridge between the evidence and the conclusion." *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (internal quotation omitted). We give the ALJ's credibility finding "special deference" and "will overturn it only if it is patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017). To determine the credibility of allegations of disabling symptoms, an ALJ may consider several factors, including objective medical evidence, daily activities, and any inconsistencies between the allegations and the record. 20 C.F.R. § 404.1529(c).

Here, the ALJ found that, while some of the symptoms Gladney described could be attributed to her impairments, the objective evidence did not point to any symptoms that are work-preclusive. The ALJ explained that she gave some weight to Dr. Stanik's opinion because it was consistent with the evidence that Gladney had some neurocognitive and mental health problems. But Gladney testified that she was unable to work at all, which neither Dr. Stanik nor any other doctor had expressed, so the ALJ believed she was exaggerating her limitations. The ALJ also noted that Gladney managed her personal life effectively, reliably taking her medication, shopping, and performing household chores, which the ALJ found incompatible with marked or extreme limits on her mental functioning. These were sufficient reasons to partially reject Gladney's testimony.

AFFIRMED